WALTZER, Judge.
This is an appeal from a judgment of the district court in accordance with a jury verdict, granting judgment:
(1). in favor of McDonald Sales Corporation (hereinafter “McDonald”) and against D.H. Holmes Co. Ltd. (hereinafter “Holmes”)[1] in the total amount of $591,-147.85 itemized as follows:
$217,865.48 Discounts on McDonald’s invoices improperly taken by Holmes.
• 55,845.10 Advertisement expenses improperly taken by Holmes.
5,420.00 Unpaid invoices.
$279,131.82 Total Principal Amount $312,016.03 Interest until November 8, 1993.
(2). in favor of McDonald Sales and against Chrysler First Wholesale Credit, Inc. (hereinafter Chrysler):
$89,994.18 Unpaid invoices.
$51,685.63 Interest until November 8, 1993
(3). in favor of Holmes and against McDonald Sales:
$106.905.91
$ 69,404.31 Interest until November 8, 1993
Additionally, the judgment grants legal interest on the principle amounts from November 8, 1993 until paid and awards total costs of $7,148.40 plus interest thereon to McDonald Sales.
D.H. Holmes and McDonald Sales did business on an open account from the 1960’s until McDonald lost its RCA distributorship in the late 80s. D.H. Holmes bought over $25 Million dollars a year from McDonald’s and was, if not its biggest, then one of its three biggest clients. Sal D’Antoni, the former Credit Manager of D.H. Holmes testified that from |2the 1960’s onward D.H. Holmes’ terms with McDonald was a 2.75% discount with payment within 150 days. McDonald’s was sold and was purchased by David Oreck. On March 7,1979, Bill Legier, Vice-President of Finance at McDonald’s, wrote to D’Antoni and told him that the 150 days credit term on invoices was “no longer available” and they offered D.H. Holmes “a 2.75% discount on all invoices billed to D.H. Holmes Credit Corporation with terms payable net upon receipt”. D.H. Holmes refused to accept these terms.
At the time, D.H. Holmes had approximately 19,000 suppliers like McDonald. D.H. Holmes received approximately 2,000 invoices per day with approximately 40 per day being from McDonald. D.H. Holmes computer issued and mailed checks every Tuesday. Invoices received by noon Friday were bundled together and transmitted to the Accounting Department, where they were checked against other documentation, whereupon a check was issued two Tuesdays hence. Two of D.H. Holmes suppliers, McDonald and Lee Leitner requested that payment be made through a financing corporation so that McDonald and Lee Leitner could recoup the 2.75% discount from their manufacturers. Accordingly, D.H. Holmes, who had a long standing policy against financing any of its inventory, set up a shell corporation for the convenience of these two suppliers. The shell corporation, D.H. Holmes Credit Co. did not actually finance anything. The D.H. Holmes Tuesday issued checks were hand carried to D.H. Holmes Credit Co., which was actually another desk in the Accounting Department. A second check in the same amount as the first was then issued on the D.H. Holmes Credit Co. checking account. Handwritten upon the check was all of the invoice numbers that the check covered. Later when invoices were photocopied instead of handwritten on the check, the D.H. Holmes data also contained a transparent overlay that looked like a stamp. The overlay was supplied by McDonald’s to D.H. Holmes and contained the exact language that McDonald’s needed to be reimbursed by RCA or Litton.
Thus when D’Antoni received the March 7, 1979 letter from Legier, he immediately called him and told him that there was no way that D.H. Holmes could pay “upon re- *3 eeipt” as the computer system simply could not handle it. Accordingly, they negotiated a deal whereby D.H. Holmes received a 2.75% discount from McDonald if payment was made “in due course”, which the parties deemed to be within 30 days of the shipping date or the ^invoice date, whichever was later.[2] D.H. Holmes continued to order from McDonald, deduct the 2.75% and pay within 30 days from March 7, 1979 through July, 1982 without complaint from McDonald.
Bill Legier retired from McDonald and R.J. Sykes was hired from outside of McDonald to take Legier’s place. On July 30, 1982, R.J. Sykes sent a letter to D.H. Holmes stating:
Please review the attached in accordance with our agreement concerning the 2.75% discount.
Our policy, per the attached, states that this discount is allowed only for payment to reach us within ten (10) working days. Your prompt attention in receiving this and remitting payment today to cover these unearned discounts will be appreciated.
Although the Sykes letter stated that McDonald’s policy was 10 days, “the attached” referred to the March 7, 1979 letter from Legier which provided terms “net upon receipt”. Attached to the letter was also a handwritten list on lined paper showing the date and number of the D.H. Holmes cheek and the amount of discount taken, totaling $58,670.82. The list, however, did not indicate the invoices involved or the shipping or invoice dates of those invoices. The D.H. Holmes checks were dated from Jan. 4, 1982 through July 21, 1982. D.H. Holmes continued to pay within 30 days and deduct 2.75% through December 31, 1983.
D.H. Holmes argues that McDonald unilaterally tried to change the terms of their arrangement, that D.H. Holmes did not agree to a change in terms and continued to do business with McDonald as usual and that McDonald acquiesced in a continuation of the terms when it continued to cash D.H. Holmes checks which were identified with specific invoices less 2.75%. We agree.
4CÍVÍI Code Article 2474 provides:
The seller must clearly express the extent of his obligations arising from the contract, and any obscurity or ambiguity in that expression must be interpreted against the seller.
Civil Code Article 1943 provides:
An acceptance not in accordance with the terms of the offer is deemed to be a counteroffer.
Civil Code Article 1906 provides:
A contract is an agreement by two or more parties whereby obligations are created, modified or extinguished.
Civil Code Article 1927 provides:
A contract is formed by the consent of the parties established through offer and acceptance.
Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.
Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made.
D.H. Holmes refused Syke’s offer to modify the terms set under Legier. When D.H. Holmes continued to send McDonald cheeks within 30 days with the 2.75% deducted, it was a counteroffer under C.C. art. 1943. When McDonald accepted and cashed the check its action constituted consent to the counteroffer. The trial court committed an error of law when it failed to apply the appropriate code articles.
In addition, the trial court erred in failing to grant the exception of prescription. *4 AQ parties agree that the relationship between McDonald and D.H. Holmes was one of an open account. Civil Code Article 3494 provides for a three year prescriptive period for open accounts. Civil Code Article 3495 further provides “[Prescription] accrues as to past due payments even if there is a continuation of labor, supplies, or other services”. The last transaction complained of occurred December 31, 1983. McDonald contends that prescription was interrupted by ac-knowledgement of the debt by various verbal statements of various D.H. Holmes employees. We disagree. While the D.H. Holmes employees in question all categorically refute McDonald’s employees testimony, this is not a credibility call issue because the D.H. Holmes employees did not have the corporate capacity to bind the |Elegal entity D.H. Holmes. Accordingly, the claim for unearned discounts prescribed on December 31, 1986 and suit was not filed until March 31, 1988. Thus the trial court erred in failing to grant the exception of prescription.
The second area at issue is the claim for $55,845.10 in advertisement expenses which McDonald alleges were improperly taken by Holmes. D.H. Holmes contends that it always had authorization to run ads and that the ads were sometimes verbally approved by Chuck McNeil, Vice President of McDonald and the number one man under President David Oreck. Most of the time McNeil followed up his verbal authorization with written approval, but occasionally he failed to do so. D.H. Holmes further argued that because of McNeil’s high rank, they relied upon his representations. D.H. Holmes further stated that they were unable to produce written authorizations that they had received because those records had been purged because the ads had already run. McDonald argued that McNeil’s verbal approvals were an abuse of his authority and that only David Oreck personally had the authority to approve ads. The jury apparently believed McDonald’s testimony. Chuck McNeil was unable to testify as he was deceased. Accordingly, under the manifest error standard, we cannot conclude that the trier of fact abused its discretion on this issue.
All parties admit that D.H. Holmes owed $5,420.00 in inadvertently unpaid invoices and at trial McDonald admitted that it owed $106,905.91 to D.H. Holmes. Having been admitted to below, these issues cannot be raised on appeal.
The last issue remaining is that of interest. The trial court awarded interest at the legal interest rate from the invoice date until the day of trial and then awarded legal interest from the date of trial until paid. Awarding interest from the invoice date where there is no written or other agreement to pay interest on past due balances, as for example in credit card agreements, results from the court’s application of Civil Code Article 2000. Prior to the enactment of this article, there could be no award of interest from the date the sum became exigible or due until judicial demand in the absence of an agreement between the parties. Civil Code Article 2000 changed this. Athough Acts 1984, No. 331 Section 1, the original legislation by which Civil Code Aticle 2000 was added did not provide for retroactive application, a later amendment clarified this point and specifically provided for | (¡retroactive application. Thus even though the amounts at issue first arose in 1982 and 1983 and the legislation was not passed until 1984, the trial court did not err in its award of damages.
For the reasons discussed the judgment of the district court is amended as follows and as amended is affirmed:
(1). in favor of McDonald Sales Corporation (hereinafter “McDonald”) and against D.H. Holmes Co. Ltd. (hereinafter “Holmes”):
$55,845.10 Advertisement expenses improperly taken by Holmes.
5,420.00 Unpaid invoices.
$61,265.10 Total Principal Amount Plus legal interest on the Principal Amount until November 8, 1993 Plus legal interest on the Principal Amount from November 8, 1993 until paid.
$ 7,148.40 Cost plus, interest thereon.
*5 (2). in favor of McDonald Sales and against Chrysler First Wholesale Credit, Inc. (hereinafter Chrysler):
$89,994.18 Unpaid invoices.
$51,685.63 Interest until November 8, 1993 Plus legal interest on the principal amount from November 8, 1993 until paid.
(3). in favor of Holmes and against McDonald Sales:
$106.905.91
$ 69,404.31 Interest until November 8, 1993 Plus legal interest on the principal amount from November 8, 1993 until paid.

AMENDED & AFFIRMED.

LOBRANO, J., dissents in part -with reasons.
MURRAY, J., dissents in part for reasons assigned by LOBRANO, J.

. Both McDonald and D.H. Holmes Eire in bankruptcy, thus the true parties in interest are bank-raptcy trustee and various creditors,

. If Holmes ordered something that McDonald did not have in stock, then the invoice date would be earlier and the shipping date would be later. Holmes would not pay for merchandise that it had not received. If, however, the shipping documents and merchandise had been received, but McDonald had not yet sent the invoice, then the shipping documents alone could not be used as the basis for issuing a check, because Holmes also needed the invoice numbers to process the documents and issue the check.